Case No. 14-1029 et al. Lucky Cab Company Petitioner v. National Labor Relations Board. Mr. Minor for the petitioner, Mr. Jost for the respondent. Petitioner v. National Labor Relations Board. Petitioner v. National Labor Relations Board. Good morning and may it please the court, my name is Fred Minor, I represent Lucky Cab Company. This case involves a review of a decision by the National Labor Relations Board that primarily involves the discharge of six former drivers in February, March, April of 2011. This was a period preceding a board conducted representation election that was held on May 6th of 2011. This was the second election in about two years. The first in 2009 was unsuccessful. The second, again conducted on May the 6th, also was unsuccessful. Employees chose not to be represented by a margin of 105 to 93. The board found the six terminations involved here retaliatory based on alleged but unknown union activity by the six drivers. The board's decision contradicted evidence in particular that two of the drivers were discharged before management became aware of the campaign. In the board's own precedence, the rule has been clear that it is neither logical nor reasonable to leap from a general knowledge of union activity to specific knowledge of an individual employee's participation. And yet that logical leap is exactly where the board erred here. Here there were approximately 240 drivers involved in a campaign, over 90 of whom eventually voted yes in a representation election, about 100 of whom must have signed authorization cards in support of an election petition, and over 40 of whom allegedly had participated in a union meeting shortly before the union's own announcement of its campaign to management. The question then becomes, out of all of these various drivers, why these particular six drivers might have been selected by management for some form of retaliation. The board's conclusion, and it painted with quite a broad brush on this, the board's conclusion was that all six must have been involved because of proximity of the drivers who were waiting for cabs at the beginning of their shifts and allegedly discussing union-related matters. This specifically contradicts the testimony of three of the drivers. It contradicts the fact that there were no public displays of union support by any of the drivers prior to the election. There were no pins, shirts, signs, or other propaganda. No one of the six drivers testified that any manager observed his or her alleged union activities. Again, two of the drivers testified quite clearly that the union instructed them to engage in a clandestine and surreptitious campaign and that they did so through the time of their terminations. Mr. Hambamo testified following the union's instructions that he approached the drivers exclusively outside the compound of the company and, quote, he worked clandestinely so that we could organize them. That's JA 358 and 378. Mr. Hambamo never circulated a card on Lucky Cab's company. This is important for a driver who spends most of his time off-site. He never spoke to a driver while on Lucky Cab's property. This is undisputed in the ALJ so far. The sure evidence you would say there was inadequate evidence of knowledge of union activity. There was not substantial evidence. And we believe that the contrary assumption by the board contradicts the evidence by at least three of the drivers that they engaged in a surreptitious campaign. Without knowledge of any of these drivers' union activities, there cannot be an inference of retaliation. Ultimately, the irony of the NLRB's decision in this case is that numerous drivers who did engage in some form of public union support were not subjected to any retaliation, whereas the six drivers here who allegedly engaged in some concealed activity were subjected to retaliation. And there is considerable evidence in the record regarding driver statements to management, endorsing the union, supporting the union, or talking about the prior 2009 campaign. Not one of those drivers, and there are at least seven of the drivers identified in the record, not one even allegedly was subjected to any interference or other kind of retaliation. But isn't it the board's position here that in fact these six employees, or at least five of them, were more than casually involved, that they were in fact the organizing committee? And so from that, the board draws an inference that it was odd that they should be specifically the people who were terminating. Your Honor, they testified themselves that there were more than a dozen drivers initially involved in the campaign. They contended that all six of the drivers were among the initial group. They contended there were more than 40 drivers involved at the union's most recent meeting prior to the publication of its notice of the campaign to management. Ultimately, the drivers who declared themselves as supporters of the union, the drivers who asked questions or spoke up at company meetings, were not subjected to any retaliation, whereas the board claims these drivers who engaged in concealed activity somehow were. We also would point out that these six drivers acknowledged engaging in serious misconduct, including intentional misconduct. The board's position would be that there were other drivers in the past who had had similar infractions and not been disciplined by termination. Correct. Your Honor, with respect to two of the drivers who were terminated for intentional falsification, the company presented evidence of more than 11 discharges of drivers under the same circumstances in the prior two years. Which terminated driver are you talking about? With respect to Ms. Gabersalase and Mr. Hailu, both were terminated for intentional falsification. Lucky Cab's rule book provides for termination in that event. And again, at least 11 drivers were terminated for that reason. With respect to the failure to record breaks, two drivers were terminated for that reason. Mr. Demeke and Mr. Tasima both previously had been disciplined for the same rule violation. Excuse me, violation. Once again, Lucky Cab presented evidence that at least 10 drivers were terminated for this same reason in the prior two years. General Counsel points out that six other drivers were not terminated, although they engaged in this same misconduct. The difference in those cases is those drivers did not have a prior record of discipline for that same rule violation. Again, Mr. Demeke had failed to record breaks. He had prior discipline for trip sheet violations, seven between May and December of 2010, five more in January and February of 2011. And Mr. Tasima was then working under a final warning specifically for failing to record his breaks at the time of his termination. With respect to the other terminations, Your Honor, the intentional falsification, the deliberate nature of that violation, the indefinite suspension of one of the driver's permits, and the early quit, the refueling more than 30 minutes prior to the end of his shift, all constituted legitimate nondiscriminatory reasons for those terminations. They all are supported by prior discipline for the same reasons. Most of these discharges occurred in the context of prior discipline, and they were not retaliatory in nature. I see I'm coming to the end of my time, Your Honor. I'd like to reserve three minutes for rebuttal. Thank you. May it please the Court, my name is Micah Jost for the NLRB. Substantial evidence supports all of the Board's findings in this case, and the company's arguments simply ignore or contradict the credited findings again and again. I want to make two primary points this morning. The first is that contrary to the company's claims, the credited evidence shows that nearly all of the drivers campaigned openly on the employer's premises. Not one of them testified that they could not have been observed. Hambamu is the sole driver who only did his solicitation. Well, that doesn't answer the question, was there evidence that they had been observed? Was there evidence that this was known to the company? Your Honor, several of them, Geber Salasa, Dumeke, Hailu, and Tessima, all testified that they distributed, excuse me, that they solicited, all of them except for Geber Salasa, also distributed the physical cards in the waiting area, which was directly in front of the employer's offices, right outside the window, and in an area where Garris, the associate operations manager, frequently mingled with the employees to smoke. So those are the opportunities that the company had to view them soliciting openly, directly in front of the management offices. The citations for that can be found for Geber Salasa at J506 and 507, where she said that she believed management knew that she was soliciting for the union. Dumeke's testimony along those lines is at 444 and 45 and 448. Hailu is at 451. Tessima is at 414. All of them testified to doing this openly and doing so in the bleachers waiting area where they were required to be for 30 minutes before every single shift, an ample amount of time for them to be observed in these activities. The second point I want to focus on is that the credited evidence shows that the employer treated each of the six drivers more harshly than others for comparable conduct. Moreover, the credited evidence shows that the employer did not act according to its consistent policy in discharging them. It doesn't hurt your case particularly, but does it appear that the company had a consistent policy? The company did not. Or they were not consistent with this. The company's claims of having a consistent policy were soundly discredited, Your Honor. From what we can tell from their records, what the records as a whole demonstrate is that where there were violations that the company considered serious, outside of the most routine sort of trip sheet violations such as failing to note a clock out, failing to sign, leaving off your telephone number, for things that the company considered more serious, which it characterizes as falsification, failure to list a break, refueling early, violating the geo-medallion, for example, for all of those instances where it's possible to tell what the company did from the record, they issued final warnings at least one time. In several cases, we cite three cases as comparators for TESIMA. Those were instances where the employer gave two final warnings for the same conduct more than six or seven months apart. It allowed the old discipline to lapse. On the opposing counsel referenced 11 drivers who were discharged. Those are at pages 40 through 42 of their brief, and a careful examination of the record shows that for six of those drivers, it's possible to tell whether they had a final warning, and they did. And for the ones where it's possible to tell how recent the final warning was, it was three months for Peter Spangler, five months for Lubin Stefanov, and four months for Yunus Ali. That demonstrates where you have a final warning for the exact same conduct within a short period of time. The company did indeed show that it would fire people. The key fact here, contrary to opposing counsel's representations in the briefs, Dumeikin was found to have no prior violations for unlisted breaks. Kindeya had no prior violations for early refueling, and Hailu had no prior violations for any kind of falsification. With regard to him, you can look at the position statement the company provided to the board at 1092 through 1094 of the joint appendix. Within those pages, there is no prior reference to the discharge offense for him, which was writing down improper fare amounts. In that regard, I also want to note, in the reply brief, the company characterizes his violation in that instance as essentially stealing fares from the company. That is utterly unsupported by the record. There is a separate violation, which the company has in numerous trip sheets, which is short book, or not turning over the full amount of book. That is not a violation that Hailu engaged in in that instance. For an example, you can see Dr. Robel Begeshaw's record at 1993 of the appendix, where the employer notes that it is an act of theft to turn over short book. Hailu was not penalized for that on the occasion when he was fired. So examining the records for all three of those individuals, it's clear they did not receive the final warning that the company, to the extent it had any consistent policy, should have given. Garris was unable to find. He did initially claim that they had final warnings, but the citations that we have in the brief, primarily I would refer the Court again to the position statement from the company, which is for Kindea at 1101, for Demeke at 1097 through 99. Those demonstrate that there was, in fact, no prior warning. So what we're left with, Your Honors, is individuals who engaged in open union solicitation, which gives rise to a reasonable inference that they were known to be part of this campaign. As was noted earlier, five of them were members of the 12 or 13-member organizing committee. The Power, Inc. decision of this Court points out that where you had a large number of people in that case, it was 13 employees discharged, eight of whom, I believe, were on the organizing committee. That's deeply suspicious. And the timing, the fact that these individuals were discharged over the two months preceding the election, that is what ties them all together. So the fact that Hambano, for example, testified that he did all of his solicitation off the employer's premises does not make the Board's use of circumstantial evidence, in this case, impermissible. Rather, the Board reasonably relied on timing, disparate treatment, which demonstrated pretext along with all of the other factors we noted, and in addition, the 80-to-1 threats, which the employer has not made any serious attempt to disprove. In numerous cases, this Court and other courts have relied on similar circumstantial evidence. I want to refer in particular to the Schaaf case in Power, Inc., where the Court was able to find that certain individuals who the company disputed knowledge as to had engaged in known union activity, even though there may have been other people there who the company had more direct evidence of knowledge. Abbey's transport from the Second Circuit and Folsom de Puerto Rico are equally important cases from this Court's sister circuits. I believe I covered this earlier, but I want to emphasize that at page 5 of the reply brief, where the employer claims that Isla was previously counseled six times for falsifying affairs, that is contradicted by the record. Once again, it's the position statement at 1092-394,  so in sum, the substantial evidence that I've canvassed, including the clearly supported, fully supported 80-to-1s, the Parsippany Hotel decision of this Court emphasizes that this sort of 80-to-1 violation can show animus where it comes from a high-level person, as it did in this case, which is Dante, regardless of the lack of any sort of direct connection to the individual discriminatees. A similar analysis is noted at Igrimo Enterprises, which is a board case that the employer cites, enforced by the Second Circuit. What was the evidence showing at what point the company or any of the management was aware of the union drive? Your Honor, there's... What's the timing? Right. There's the undisputed letter on February 25th, so from that point forward, there were two individuals fired prior to that time, Debra Salas on February 24th, D'Amichi on February 25th, and the testimony from Dante... The letter is dated what? February 25th, Your Honor. February 25th, so one firing is referred to as 24 and one is 25. One is the very day of that letter, right. But the board's findings, based on credibility determinations which the company has not given any reason to overturn, were that Dante received questions from drivers and that those questions came to her shortly after the distribution of cards began, which was February 8th, so it would have been in that earlier period. The final point that I want to note with regard to Hambano, for whom the circumstantial evidence of knowledge is not quite as direct as the others, the circumstances of his discharge are particularly suspicious in regard to... for the same offense, which is to say a suspended permit, and indeed its policy did not call for discharge. It called for discharge only for a revoked permit. The ALJ found that the company forged a document showing that they had fired somebody else. That's right. That was a probationary employee. As Garris himself testified, probationary employees, I believe it's at 587 of the appendix, probationary employees are treated differently. They don't have a track record with the company, so they're not comparators. One of the board cases the company cites, the guard publishing, has the same analysis. I thought the ALJ's statement was that the document showing that there was another employee was computer-generated for this case. Right. If I may, Your Honor, there are two pages there for employee Nikoli Atanasoff. The first page is the actual discharge for him, which simply says that he failed probation. The second page is the one that suspiciously has a computer-generated date shortly before the hearing. It's on that page. 2011, right? It was 2011. Right. Yes. The date on the second page. Right. And that page is the one that says that he failed to maintain a TA permit. First of all, it doesn't say that it was revoked or suspended, so it's not even helpful in that regard. But in any event, there was substantial evidence for the ALJ to conclude that that was falsified because of the date. It either isn't clear from the record or wasn't clear to me. Could he do the job? Could the driver do the job? Were they suspended? He couldn't physically go drive a taxi cab, but, of course, the company gave leaves of absence liberally. It emphasized, in fact, that it gave 60-day leaves of absence. The three prior individuals who had suspended permits and whom the company didn't fire, which are Abzu, Worky, and Domecki on a prior occasion, those individuals were allowed to remain employees even if they weren't out on the road during that time. For the reasons we've described, I would ask the court to enforce the board's order in full. Your Honor, I understood counsel to argue that all of these drivers had engaged in public campaigning, and that is contrary to the record. I also heard counsel concede or acknowledge that Mr. Hambama had not engaged in any union-supporting activity on Lucky Cab's property. I also would point out, with respect to Mr. Tasima, that he specifically testified he did not believe any manager or supervisor could have seen him talking with another driver about the union or engaging in any other union activity. That's at JA 419-20. With respect to Mr. Kandaya, he also specifically testified that he did not engage in any union discussions anywhere near management's offices or facilities, in other words, where drivers wait for their cabs. He avoided that area because of the union's directive to conceal the union's campaign. Specifically, I would take a look at JA 424-425 in that regard. Even with respect to the other drivers who claimed that they discussed the campaign, this activity has to be understood in the context of discussions specifically. Ms. Gabersolase specifically testified she never circulated any authorization cards whatsoever, claiming she did not have them at the time other drivers allegedly received them. Her discussions could not have been understood by Lucky Cab management. The drivers in this case all testified through interpreters. Management at Lucky Cab is not familiar with the Ethiopian dialect that is their primary language. The discussions among drivers that may have occurred at the beginning of their shifts does not indicate management knowledge of a union campaign by these individuals. With respect to the subject of discipline, four of the drivers specifically were disciplined for the reasons stated earlier. In particular, Mr. Tasima was under a final written warning for failure to record his breaks, specifically the same reason he was terminated for as of April 6th, his termination. His final warning is indicated at JA 896. Mr. Hailu was under a final warning for his multiple trip sheet violations. That's at JA 1134. His termination was because of falsification of fares specifically. On one particular day, the evidence showed that he was reporting fares that were $5 to $7 lower than they actually were. That sounds like theft to Lucky Cab. Mr. Kandaya is undisputed refueled early. He had previously been disciplined for that specific offense. That's at JA 338 and 611. And Mr. Demeke had been disciplined for his trip sheet violations. That's at JA 1168 and 339. I see I have gone over my time.  Thank you. The case will be submitted.
judges: Brown, Sentelle, Randolph